UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:14-cv-00683-MOC-DCK

| | | |
|---|---|---|
| **DARLENE TALLEY,** individually, and as guardian *ad litem* of Tanisha Williams, an incompetent person, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| Vs. | ) ) | **ORDER** |
| **CITY OF CHARLOTTE,** et al., | ) ) | |
| Defendants. | ) | |

**THIS MATTER** is before the court on the following Motions: Motion for Summary

Judgment by the City of Charlotte (#58); Motion for Summary Judgment by Wayne Goode, III

(#61); and Motion for Summary Judgment by Joseph White (#65). This matter has been fully

briefed and is ripe for review. The court held oral arguments on these motions on June 23, 2016.

Having considered the applicable legal authority, the arguments of counsel, and the facts of this

case, the court enters the following findings, conclusions, and Order.

## FINDINGS AND CONCLUSIONS

### I.    FACTUAL BACKGROUND

This lawsuit arises out of events that occurred during the arrest of Tanisha Williams for

shoplifting in downtown Charlotte, North Carolina. The facts are largely undisputed by the

parties, except to the extent that the transcript of the video dash camera provided by Plaintiff

differs slightly from that provided by Defendants, a subject discussed <u>infra</u>. Plaintiff has offered

undisputed evidence that Ms. Williams has a history of mental illness, had been diagnosed as bi-

polar, and had received inpatient care at two different facilities prior to this arrest. <u>See</u> (#71-3; 71-4; 71-7).

The events giving rise to this lawsuit are as follows. On December 5, 2011, Ms. Williams was in a store in Charlotte called "Citi Trends" around 7:00 pm. After purchasing an item, she walked out the door and the security sensor triggered. The Citi Trends manager, Christine Williams (no relation to Plaintiff) (hereinafter "Manager Williams") called the police to alert them of a potential shoplifter. Officer Terry Scott Howard (not a party to this lawsuit) was working "secondary employment" that night and was eating dinner in a restaurant in the shopping center. He responded to the call and went to Citi Trends, where he met Ms. Williams and Manager Williams. Ms. Williams denied having stolen anything. After some investigation, Officer Howard and Manager Williams determined that Ms. Williams had attempted to walk out of the store wearing a t-shirt under her clothes that she had not paid for. There was a hole in the t-shirt where the security sensor would have been and Ms. Williams was inexplicably holding a security sensor in her hand. Ultimately, Officer Howard placed Ms. Williams under arrest. As Howard handcuffed Ms. Williams, she loudly stated, "I didn't steal nothing. I got money. You know, I didn't steal no shirt." (Howard Dep. (#59-5) at 49:18-21). He then escorted Ms. Williams out of the store, radioed for a transporting officer, and tried to put her in his car until the transporting officer arrived. <u>Id.</u> at 50:1-10. He described her demeanor at this point as "agitated as being upset that she was arrested...." <u>Id.</u> at 53:20-22. He tried to place Ms. Williams in the rear passenger seat of his car; she continued yelling and repeating that she had not stolen the shirt. <u>Id.</u> At one point, Ms. Williams stopped yelling and coughed up a lollipop, which had the paper stem broken off. <u>Id.</u> at 54:16-22, 57:2-5. Officer Howard testified that he had not

previously noticed the lollipop. Id. at 54:18-55:6. Manager Williams testified that she heard Officer Howard say, "oh my God, you had that in your mouth. You could have killed yourself. What are you doing?" and that she saw him hit Ms. Williams on the back to get the lollipop out. (Williams Dep. (#71-10) at 65:10-25).

Officer Wayne Goode III responded to Officer Howard's call for an on-duty officer to come to the scene. (Howard Dep. at 56:20-58:15). Once Officer Goode arrived, he parked his patrol car at the front of the store, nose-to-nose with Officer Howard's vehicle, placed his handcuffs on Ms. Williams, and then placed her in his vehicle. Ms. Williams continued to deny stealing the shirt and to protest loudly. Id. at 58:16-18. She also began bumping her head against the plexiglass partition between the front and back seats in the patrol vehicle. Id. at 75. Officer Howard testified that there was no force of any magnitude to these initial bumps to the shield. Id. Officer Goode testified that the shield in his vehicle had a pre-existing crack. (Goode Dep. (#59-7) at 75:3-6). Once Ms. Williams began hitting her head on the partition, Officer Goode reached into the car and turned the dashboard camera around to record Ms. Williams' actions. Id. at 54:14-24). Officers Goode and Howard both testified that Ms. Williams began to strike her head harder against the partition and continued to scream that she did not steal the shirt. Id. at 55:10-23; Howard Dep. at 78:23-79:5).

The dash camera video, which the court viewed at the hearing, reveals the scene in the back of the car. Over a span of approximately 10 seconds, Ms. Williams, continuing to deny that she stole the shirt, violently strikes the partition with her head 10 times. (DMVR at 19:02:47-:56). During this 10 second span, an officer can be heard saying, "Will you quit that? You're going to hurt yourself." (DMVR at 19:02:49-:54). Following the head strikes, Ms. Williams

strikes the partition with her left shoulder 5 times over a span of 5 seconds. (DMVR at 19:03:03-08). The transcript offered by Plaintiff includes a statement at DMVR 19:03:28 by Ms. Williams saying "I didn't steal the shirt...I gonna hurt—I'm gonna kill my f***ing self. I didn't steal the shirt."[1] The violent head strikes and shoulder strikes begin and end within approximately 21 seconds.

A third CMPD officer, Officer Joseph White, arrived around the time that Ms. Williams started hitting her head against the partition and parked his car directly next to Officer Goode's patrol car. (White Dep. (# 59-8) at 31:3-11; 58:7-8). Officer Howard went inside the store to complete the arrest paperwork soon after White arrived. (Howard Dep. at 69:8-24). Defendants state that in response to Ms. Williams's screams and partition strikes, the officers searched for a RIPP hobble (a leg restraint that is usually affixed to a subject's ankles) to try to deescalate the situation. (Goode Dep. at 54:24-55:2). Officer Goode looked for one in his car but could not find one. Id. at 92:14-97:2). Officer White located one in his car. (White Dep. at 38:9-10). Defendants state that at no point in time were the officers more than two to three feet from Officer Goode's vehicle, where Ms. Williams was still sitting in the backseat. (Goode Dep. at 92:7-13). They state that at or around the time White retrieved a RIPP hobble from his vehicle, Ms. Williams stopped striking the partition. Id. at 91:20-92:1. Because she had quieted down and stopped striking the partition, the officers believed she was no longer a threat to herself, there was no immediate need to utilize the RIPP hobble, and that attempting further restraint could have re-aggravated her and

---

[1] At the hearing, the court viewed the dash camera video of the scene in the back of Officer Goode's car. That recording was played using an AV player, which the parties represent clarifies recorded sounds. Using this technology, and when its attention was specifically directed to the exact moment in the video where Ms. Williams makes a statement about suicide, the court was able to make out the statement. However, the court notes that the statement is extremely muffled, as Ms. Williams is screaming and crying while speaking at the same time.

caused her to begin striking her head again or otherwise cause injury to herself or others. Id. at 97:6-16; White Dep. at 62:4-9. Officers Goode and White also testified that they discussed waiting until a sergeant arrived on the scene before they used the RIPP hobble so that he could assist and supervise them. Goode Dep. at 110:18-111:16; White Dep. at 55:10-56:3.

From the time the dashboard camera is turned around to face Ms. Williams (at about 19:02:32) until when the head and shoulder strikes were complete (19:03:37), officer presence is consistently seen or heard on the DMVR, at the rear driver side of Officer Goode's vehicle. At the 19:03:37 mark, no officer presence is seen or heard within the range of the dashboard camera. (DMVR at 19:03:37). As the officer presence leaves the range of the dashboard camera, Ms. Williams, with her hands cuffed behind her back, positions herself on her knees, faces the back seat, ducks her head under the seatbelt and extends it. (DMVR at 19:03:53). By 19:04:13, Ms. Williams has extended the seatbelt, looped it around her neck, audibly choked, and sat back down. (DMVR at 19:03:53-:04:13).

Visible officer presence returns, at the rear windshield, approximately 15 seconds after Ms. Williams begins to asphyxiate in the back seat of the vehicle. (DMVR at 19:04:28). Ultimately, the officers are visually and audibly absent from the DMVR for only 51 seconds. Within 12 seconds of the officer presence returning to the rear windshield, the officers return to the rear driver's side window and can be heard talking to Ms. Williams. (DMVR at 19:04:40). After asking how she is feeling, Officer Goode says, "quit doing what you're doing. You ain't going to hurt yourself." (DMVR at 19:04:43). At this point, it is unclear whether the officer can tell that she has a seatbelt wrapped around her neck or not. Ms. Williams moves in the back seat as the officers ask for her name. (DMVR at 19:04:42-:53). An officer opens the rear driver's side

door and leans in to check on her. (DMVR at 19:05:04). Ms. Williams moves slightly as the officer nudges her and again asks for her name. (DMVR at 19:05:10-:11). An officer is heard commenting that he can see that she is breathing. (DMVR at 19:05:18). Ms. Williams continues to move in her seat as the officers try to get her to talk to them and identify herself, though she does not speak at all.

After approximately three more minutes, Officer Goode gets inside his vehicle and sits in the driver's seat to try and identify Ms. Williams on his mobile computer, running the name "Darlene Talley," which was on a keychain in Ms. Williams' possession. (DMVR at 19:08:06-:09:42). He continues to ask her questions without receiving any response from her. At one point, he turns to look back at her and then gets out of the car. (DMVR at 19:09:40). After Officer Goode exits the vehicle, a flashlight is shined on Ms. Williams, showing her slumped in her seat. (DMVR at 19:09:49-54). Thereafter, the rear driver's side door is opened again, as Officer Goode leans in to physically check on Ms. Williams a second time. (DMVR at 19:10:03). Officer Goode exclaims, "Oh shit!" and cuts the seatbelt loose. (DMVR at 19:10:07-21). Officer White calls for medical assistance. (DMVR at 19:10:32). Ms. Williams is pulled out of the vehicle and life-saving efforts begin. (DMVR at 19:10:55). The lead Medic on the scene testified that when he got to the scene (at SMVR 19:18:34), Ms. Williams was not breathing on her own but was receiving ventilation support. (Heasley Dep. (#59-9) at 30)). She was ultimately taken to Carolinas Medical Center for treatment in the Intensive Care Unit. See (#71-7) at p. 4-5.

As a result of Ms. Williams trying to choke herself with the seatbelt, she sustained significant damage to her trachea, which resulted in a tracheotomy, as well as severe brain injuries due to lack of oxygen. Id. Ms. Williams is now unable to speak or care for herself, relies

on others for all aspects of daily living, and is wheelchair bound. Id. at p. 13-14. The lead Medic who responded to Officer White's call found that Ms. Williams had a minor laceration on her forehead that was not actively bleeding and did not require treatment. (Heasley Dep. at p. 30-32).

Plaintiff Darlene Talley, individually and as guardian ad litem for Ms. Williams, filed her Amended Complaint (#23) on May 15, 2015. The Amended Complaint alleged the following Causes of Action: 1) gross negligence of Defendant City of Charlotte (Count I); 2) negligence and gross negligence of Defendants Joseph White, Wayne Goode III, and John Doe, in their individual and official capacities (Counts II, III, IV); 3) 42 U.S.C. § 1983 liability of Defendants Joseph White, Wayne Goode III and John Doe, in their individual and official capacities (Count V); 4) 42 U.S.C. § 1983, liability of Defendant City of Charlotte (Count VI); and 5) violation of Title II of the Americans with Disabilities Act against City of Charlotte (Count VII). After discovery was complete, Defendants moved for summary judgment as to each claim asserted.

Plaintiff's general allegation in this lawsuit is that the officers heard Ms. Williams make suicidal threats and failed to respond in a manner that prevented her from attempting to harm herself, and failed to make appropriate efforts to restrain her or call for medical help after they saw her banging her head repeatedly against the plexiglass partition. Defendants argue that the recorded events on the dash camera show that the officers do not see or hear her trying to choke herself, that they are all genuinely surprised that she had a seatbelt around her neck, and they immediately begin life-saving efforts once they realized that she needed medical assistance.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. That party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252.

## III. DISCUSSION

### A. City of Charlotte's Motion for Summary Judgment

#### 1. *Negligence and Gross Negligence*

Defendant City of Charlotte ("the City") argues that it is entitled to summary judgment on all of Plaintiff's official-capacity state tort claims. First, the City argues that it is at least entitled to partial summary judgment on Plaintiff's state tort claims of negligence and gross negligence on the basis of governmental immunity.

##### a. *Government/Municipal Immunity*

"As a general rule, the doctrine of governmental, or sovereign immunity bars action against, inter alia, the state, its counties, and its public officials sued in their official capacity." Arrington v. Martinez, 716 S.E.2d 410, 414 (N.C. Ct. App. 2011) (quoting Herring v. Winston–Salem/Forsyth County Bd. of Educ., 529 S.E.2d 458, 461 (N.C. Ct. App. 2000)). "The doctrine applies when the entity is being sued for the performance of a governmental function." Id. North Carolina law generally provides immunity to a municipality if its employees negligently perform a governmental function. Clayton v. Branson, 570 S.E.2d 253, 256–57 (N.C. Ct. App. 2002). See also Evans v. Chalmers, 703 F.3d 636, 655 (4th Cir. 2012) ("Clearly, North Carolina municipalities enjoy governmental immunity from state common-law tort claims arising out of their performance of government, as opposed to proprietary functions."). As relevant in this case, "the provision of police services constitutes a government function protected by governmental immunity," Evans, 703 F.3d at 655, and includes the "training and supervision of officers by a police department." Lyles v. City of Charlotte, 461 S.E.2d 347, 350 (N.C. Ct. App. 1995), rev'd in part on other grounds, 477 S.E.2d 150 (N.C. 1996). See also Clayton, 570 S.E.2d at 257 ("Law

enforcement is well established as a governmental function.") (citation omitted). Additionally,

"[a]n officer acting in his official capacity shares the municipalit[y's] immunity or waiver."

Clayton v. Branson, 570 S.E.2d 253, 257 (N.C. Ct. App. 2002).

Pursuant to N.C. Gen Stat. § 160A–485, a municipality may, but is not required to, waive

immunity to the extent that the municipality is indemnified by an insurance contract. Id. Such

immunity is waived only to the extent of coverage provided. Id.; Wright v. Gaston Cnty., 698

S.E.2d 83, 88 (N.C. Ct. App. 2010). As relevant in this case, the City voluntarily waived its

governmental immunity up to $1,000,000 through the City Council's ratification of City

Ordinance No. 4289. See Ordinance 4289, October 12, 2009 (#59-2 at p. 6). The City, however,

retains its immunity from civil tort liability for any amounts above $1,000,000. Id. at ¶¶

9-10. It is well established that "North Carolina law holds that courts may not lightly infer a

waiver of immunity." Evans v. Chalmers, 703 F.3d 636, 655 (4th Cir. 2012) (citing Guthrie v.

N.C. State Ports Auth., 299 S.E.2d 618, 627 (N.C. 1983)).

In the Amended Complaint, Plaintiffs alleges gross negligence as to the City by virtue of

the following:

> a. It failed to ensure that the CMPD adequately trained, supervised, instructed
> and/ or monitored its employees and agents regarding the safety of arrestees once
> taken into custody;
> b. It failed to ensure that the CMPD established reasonable and appropriate
> policies and procedures governing the manner in which CMPD personnel would
> respond to calls involving potential suspects;
> c. It failed to ensure that the CMPD had established reasonable and appropriate
> policies regarding the hiring, promotion, and retention of law enforcement
> personnel;
> d. It failed to ensure that all Charlotte-Mecklenburg Department personnel
> complied with existing policies and procedures with regard to the arrest and
> detention of an arrestee which demonstrated signs of extreme duress, including
> but not limited to, mental disorders and suicidal tendencies;
> e. It failed to act appropriately after becoming aware that an arrestee poised a

-10-

significant risk of harm to herself; and,
f. It was careless and negligent in such other ways as may be identified during the
course of discovery and/or trial.

See Amended Complaint (#23) at ¶¶ 79-83. Plaintiff also alleges that the City is liable for the

negligent acts and omissions of Defendant Officers White, Goode, and/or John Doe, whose

alleged negligence is imputed to the City through the doctrines of agency, vicarious liability, and

respondeat superior. Id. The allegations in Count One relate directly to Defendant's law

enforcement activities, which constitute a governmental function. Thus, sovereign immunity

would bar the negligence claims absent a waiver. See, e.g., Pettiford v. City of Greensboro, 556

F. Supp. 2d 512, 524-25 (M.D.N.C. 2008).

Here, during the relevant time period, the City possessed a liability insurance policy

indemnifying the City for covered losses between $2,000,000 and $7,000,000. See (Poe Aff.

(#59-2) ¶¶ 11-13, Ex. 2). In other words, under the liability policy, the City maintains a

$2,000,000 self-insured retention and coverage limits of $7,000,000. The policy includes an

exclusion which is found in the "North Carolina – Governmental Immunity Endorsement":

> This policy is not intended by the Insured to waive its governmental immunity as
> allowed by North Carolina General Statutes Sec. 115C-42, Sec. 153A-435 or Sec.
> 160A-485, as applicable, or any amendments thereof. Accordingly, subject to this
> policy and the Limits of Insurance shown on the Declarations Page, this policy
> provides coverage only for occurrences or wrongful acts for which the defense of
> governmental immunity is clearly not applicable or for which, after the defenses is
> asserted, a court of competent jurisdiction determines the defense of governmental
> immunity not to be applicable.

(Poe Aff., Ex. 2 (#59-2) at p. 32). Plaintiff does not contest the fact that North Carolina law and

the exclusionary language in the City's liability insurance policy indicates that the City, as well

as the officers sued in their official capacities, have not waived the defense of governmental

immunity above the $1,000,000 amount waived by City resolution. See Clayton v. Branson, 570

S.E.2d 253, 257 (N.C. Ct. App. 2002) (stating that "[a]n officer acting in his official capacity shares the municipalities immunity or waiver").  However, Plaintiff argues the City has implicitly waived its governmental immunity for tort claims by settling the tort claim of <u>Georgia Ferrell v. City of Charlotte, et al.</u>, 3:14-cv-47 (dismissed May 22, 2015) for $2,250,000 and electing to use funds from its insurance policy to pay the portion of the settlement above $2,000,000. Plaintiff offers no case law, evidence, or argument other than this conclusory statement to support such contention. N.C. Gen. Stat. § 160A-485 clearly provides that "no city shall be deemed to have waived its tort immunity <u>by any action other than</u> the purchase of liability insurance." <u>Id.</u> (emphasis added). <u>See also</u> <u>Jones v. City of Durham</u>, 643 S.E.2d 631, 636 (N.C. Ct. App. 2007) ("Our appellate courts have consistently held that 'N.C.G.S. § 160A-485 provides that the <u>only</u> way a city may waive its governmental immunity is by the purchase of liability insurance.'") (emphasis in original).

Having considered the matter, the court finds that the City's governmental immunity bars Plaintiff from recovering more than $1,000,000 on her official capacity state law claims— specifically, her claims of negligence and gross negligence—and the City and the officers in their official capacities. Defendants are thus entitled to partial summary judgment on this basis.

b.  *Lack of Genuine Issue of Material Fact to as Count I (Gross Negligence)*

Second, the City argues that Plaintiff is unable to point to any record evidence to create an issue of fact as to her direct negligence claim against the City. Plaintiff does not respond to this contention in its brief and presented no argument at the hearing. Nonetheless, regarding the merits of Plaintiff's claim, "gross negligence" is willful or wanton conduct "'done with conscious or reckless disregard for the rights and safety of others.'" <u>F.D.I.C. ex rel. Co-op. Bank</u>

v. Rippy, 799 F.3d 301, 314 (4th Cir. 2015) (quoting Yancey v. Lea, 354 N.C. 48, 52 (2001)). Although "ordinary" negligence rests on the assumption that the defendant "should have known the probable consequences of his act," gross negligence "rests on the assumption that [the defendant] knew the probable consequences [of his act], but was recklessly, wantonly or intentionally indifferent to the results." Akzona, Inc. v. S. Ry. Co., 314 N.C. 488, 496 (1985); accord Ray v. N.C. Dep't of Transp., 366 N.C. 1, 13 (2012). "In other words, North Carolina law ... require[s] a showing of intentional wrongdoing in order to sustain a claim of gross negligence….[t]hus, a claim for 'gross negligence' will lie where the defendant either deliberately or recklessly shirked his known duty." Garcia v. United States, No. 4:15-CV-88-FL, 2016 WL 916432 (E.D.N.C. Mar. 10, 2016) (internal citations and quotation marks omitted) (alterations in original). Here, Plaintiff's gross negligence claim as to the City stems from allegations that the City failed: 1) to adequately train its officers; and 2) to establish reasonable and appropriate policies and procedures regarding "the manner in which [City] personnel would respond to calls involving potential suspects" and "the hiring, promotion and retention of law enforcement personnel." See Amended Complaint (#23) at ¶¶ 81-83.

The City contends that Plaintiff has failed to put forth any evidence as to such claims. The City notes that though it does not have the burden to do so, it has presented evidence of its relevant law enforcement policies in effect as of December 5, 2011, including City directives on "Management of Subjects in Extreme Distress" and "Prisoner Transport." (Goode Dep. 15:11-18, 26:21-24, Ex. 1 and 2). The City also notes that it has provided expert testimony opining that its law enforcement policies and training on dealing with emotionally disturbed persons, managing subjects in extreme distress, subjects with mental illness, and positional asphyxia and

excited delirium is consistent with, and exceeds that of, others around the country. (Wallentine Decl. (#59-4), Ex. 1 at p. 11). It has also provided evidence on the training that Officers Goode and White received on ADA mental illness, the ADA generally, prisoner transport, and managing subjects in extreme distress. See (Conn Decl. (#60-1), ¶¶ 4, 6, Ex. 1 and 2, Apr. 13, 2016) (Howard Dep. 27: 8-21). Officer White received 40 hours of crisis intervention team training, which included training on how to respond to individuals with histories of mental illness. See (Conn Decl. ¶ 6, Ex. 2). (White Dep. 90: 2-13).

Given the complete lack of evidence supporting Plaintiff's direct liability claims against the City regarding its alleged failure to train and failure to establish appropriate policies, and given the City's uncontroverted evidence in defense thereof, the court will **GRANT** summary judgment to the City on such claims.

### c. *Vicarious Liability of the City Based on the Officers' Conduct.*

Finally, the City argues that it is entitled to summary judgment on Plaintiff's vicarious liability claims on the basis of the officers' public official immunity and qualified immunity. Plaintiff has claimed that the alleged negligent acts of Defendants White, Goods, and/or John Doe (the "Defendant Officers") were committed while acting within the scope and course of employment with CMPD and the City, and that their negligence is imputed to the City under the principle of respondeat superior. See Amended Complaint (#23) at ¶ 83. Thus, such negligence claim against the city is partially derivative of, and dependent upon, the resolution of the negligence claims against the Defendant Officers. Because, as explained below, the court finds that a genuine issue of material fact on the negligence claims precludes the granting of summary judgment as to those Defendants, the court will **DENY** summary judgment to the City to the

extent that the City may be held vicariously liable for the acts of its officers. <u>See</u> <u>Prior v. Pruett</u>,

550 S.E.2d 166, 172-73 (N.C. Ct. App. 2001) ("Without a[n] underlying negligence charge

against the deputies, a claim of negligence against the Sheriff and County can not be supported.

In holding that the underlying negligence charge presents a genuine issue of material fact, it

would be improper to grant summary judgment as to the issue of liability on the part of the

County and Sheriff's department.") (internal citation omitted).

### 2. *42 U.S.C. § 1983*

To prevail on a § 1983 claim, Plaintiff must show that: (1) she was deprived of a federal

statutory or constitutional right; and (2) the deprivation was committed under color of state law.

<u>Lytle v. Doyle</u>, 326 F.3d 463, 471 (4th Cir. 2003). Regarding § 1983 municipal liability claims

involving alleged police misconduct, "[l]ocal governing bodies ... can be sued directly under §

1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be

unconstitutional implements or executes a policy statement, ordinance, regulation, or decision

officially adopted and promulgated by that body's officers." <u>Monell v. Dep't of Soc. Serv. of the

City of N.Y.</u>, 436 U.S. 658, 690 (1978). "[A] municipality cannot be held liable <u>solely</u> because it

employs a tortfeasor ... in other words, a municipality cannot be held liable under § 1983 on a

<u>respondeat superior</u> theory." <u>Id.</u> at 691 (emphasis in original). "Instead, it is when execution of a

government's policy or custom, whether made by its lawmakers or by those whose edicts or acts

may fairly be said to represent official policy, inflicts the injury that the government as an entity

is responsible under § 1983." <u>Id.</u> at 694. For a municipality to be liable under § 1983, the

constitutional deprivation must be caused "through an official policy or custom." <u>Lytle</u>, 326 F.3d

at 471 (citation omitted).

In <u>Carter v. Morris,</u> 164 F.3d 215 (4th Cir.1999), the Fourth Circuit identified four possible sources of "official policy or custom" giving rise to municipal liability: (1) "written ordinances and regulations;" (2) "affirmative decisions of individual policymaking officials;" (3) omissions by policymaking officials "that manifest deliberate indifference to the rights of the citizens;" or (4) a practice "so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." <u>Id.</u> at 218 (quotations and citations omitted). "Outside of such formal decision-making channels, a municipal custom may arise if a practice is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." <u>Id.</u> (citation and internal quotation marks omitted). The Fourth Circuit also cautioned in <u>Carter</u>:

> We must bear in mind…that no municipality can be held liable under § 1983 on a <u>respondeat superior</u> theory...A plaintiff's theory is most likely to slip into that forbidden realm when she alleges municipal omission-either a policy of deliberate indifference or the condonation of an unconstitutional custom. Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.

<u>Id.</u> (internal citation omitted). Accordingly, "a plaintiff cannot rely upon scattershot accusations of unrelated constitutional violations to prove either that a municipality was indifferent to the risk of her specific injury or that it was the moving force behind her deprivation," but instead "must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a <u>particular</u> constitutional or statutory right will follow the decision." <u>Id.</u> (citations omitted) (emphasis in original). "[T]he inadequacy of police training may serve as the basis for § 1983 liability," but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." <u>City of Canton v. Harris</u>, 489 U.S.

378, 388 (1989).

Here, Plaintiff has asserted a violation of 42 U.S.C. § 1983 as to the City, arguing that the City: 1) maintained customs that were the moving force behind the alleged constitutional violation of Plaintiff's right to prompt, adequate, and necessary medical care of individuals detained and in custody of law enforcement; 2) failed to train its officers on suicide prevention and addressing the needs of mentally ill persons; and 3) that such failure to train amounted to deliberate indifference to the rights of persons with whom the police come in contact. Plaintiff contends that the City's negligent acts and omissions, include:

> a. Failing to properly train White, Goode, and John Doe;
> b. Failing to supervise and control subordinates;
> c. Failing to correct unconstitutional practices, amounting to a reckless or callous indifference to the constitutional rights of others;
> d. Failing to monitor, evaluate, and discipline officers of the CMPD with deliberate indifference to Ms. Williams'[] constitutional rights…

See Amended Complaint at ¶ 125. Plaintiff maintains that there is evidence from which a factfinder can conclude that the City repeatedly showed deliberate indifference to the medical needs of arrestees in custody, which amounted to a custom of depriving an arrestee of "federal rights."[2] Plaintiff thus makes her arguments arising under the "condoned custom theory."

For liability to attach for an unconstitutional custom or usage, "(1) the municipality must have 'actual or constructive knowledge' of the custom and usage by its responsible policymakers, and (2) there must be a failure by those policymakers, 'as a matter of specific intent or deliberate indifference,' to correct or terminate the improper custom and usage." Randall v. Prince George's County, Md., 302 F.3d 188, 210 (4th Cir. 2002). A custom or usage

---

2 As discussed infra, an allegation of deliberate indifference to the health of a pretrial detainee is governed by the Fourteenth Amendment.

cannot be established by proof of a single constitutional violation. See Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir.1987) ("proof of a single violation ... obviously cannot support an inference that the violation resulted from a municipally condoned custom of comparable practices").

Plaintiff argues that despite its alleged training, CMPD officers repeatedly expressed a deliberate indifference to the medical needs of arrestees in custody. As an example, Plaintiff cites the testimony and statements of Officer Howard, who observed Ms. Williams choking and violently banging her head. Howard testified and gave a statement the night of the incident stating that his first thoughts after observing Ms. Williams choking were "In the past, I'm sure you guys have had it where they act like they gonna pass out or you know, go into spasms....I aid she's gonna try to damn get medic, and try to get out and go to jail—get out of going to jail..." (Howard Dep. (#71-9) at p. 66). Plaintiff argues that this statement shows a pervasive and complete disregard and indifference to Ms. Williams' health. As another example, Plaintiff notes that Officer Goode was involved in a similar arrest scenario in which he failed to provide medical care to an arrestee who had repeatedly banged his head, causing injury, and made a direct request for medical treatment. In that unrelated incident, Officer Goode commented to the arrestee, "Keep going man. Have fun." See (#71-26) (Supervisors Synopsis) at p. 3. Plaintiff contends that Goode's statement is direct evidence of deliberate indifference to the health and safety of the arrestee he was transporting, and notes that the City allowed him to continue working and took no action to formally discipline him after that incident.

Here, Plaintiff has presented the court with evidence of two incidents of what it contends amount to a deliberate indifference of the health of arrestees. Even assuming that these two

isolated incidents violated constitutional rights, the court finds that they come nowhere near close to being a "widespread and permanent" practice necessary to establish municipal custom. See, e.g., Gaddy v. Yelton, No. 1:10CV214, 2011 WL 3608023, at *6 (W.D.N.C. Aug. 16, 2011) ("[T]he word 'widespread' must be taken seriously. It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. The plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.") (quoting Phelan v. Cook Cnty., 463 F.3d 773, 790 (7th Cir. 2006)). See also Wallace v. Coulter, No. 5:10-CV-354-FL, 2014 WL 582975, at *8 (E.D.N.C. Feb. 13, 2014) ("These two instances [of alleged illegal searches and seizures] fail to show a 'persistent and widespread' practice of unconstitutional searches and seizures. Thus, plaintiffs' claim under § 1983 against defendant … for an unconstitutional policy or custom fails as a matter of law."). Because Plaintiff has failed to establish the existence of a municipal custom, the court will **GRANT** the City's Motion for Summary Judgment as to the § 1983 claim asserted against it (Count VI).

### 3. *Americans with Disabilities Act*

Finally, the court has considered the City's Motion for Summary Judgment as to the claim asserted against it pursuant to the Americans with Disabilities Act ("ADA"). Title II of the ADA prohibits discrimination by any public entity, including states and their instrumentalities and agencies, by providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §

12132. "Discrimination" under the statute includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability...." Id. § 12112(b)(5)(A). To state a claim under Title II, a plaintiff must allege that she: 1) has a disability; 2) is otherwise qualified to receive the benefits of a public service, program, or activity; and 3) was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of a disability. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005). "In the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees." Waller ex rel. Estate of Hunt v. Danville, VA, 556 F.3d 171, 174 (4th Cir. 2009) (citing Gohier v. Enright, 186 F.3d 1216, 1220-21 (10th Cir. 1999); Gorman v. Bartch, 152 F.3d 907, 912-13 (8th Cir. 1998)). The latter line of cases has addressed situations where a public entity allegedly violated the ADA by discriminating against a disabled individual in its provision of services, activities, or programs during the course of an arrest. See, e.g., Calloway v. Glassboro Dept. of Police, 89 F.Supp.2d 543 (D.N.J. 2000) (finding ADA applicable to a situation where a deaf person was subjected to police investigative questioning without the assistance of a qualified interpreter); Lewis v. Truitt, 960 F.Supp. 175, 178 (S.D.Ind. 1997) (ADA claim exists in an arrest situation where a plaintiff shows that he is disabled, that the arresting officers knew or should have known of the disability, and the officers arrested plaintiff because of legal conduct related to his disability); Barber v. Guay, 910 F.Supp. 790, 802 (D.Me.

1995) (a plaintiff's claim "that he was denied proper police protection and fair treatment due to his psychological and alcohol problems" during investigation and arrest stated a valid cause of action under the ADA). As recently noted by this court's colleague, "[e]xamples of [a failure to accommodate a disability] claim would be a paraplegic arrestee's claim for injuries received when transported in a police van without wheelchair restraint…or the failure to provide the means of effective communications to a deaf individual during an [sic] police investigation." Estate of Saylor v. Regal Cinemas, Inc., 54 F. Supp. 3d 409, 425 (D. Md. 2014) (citing Gorman, 152 F.3d at 912; Seremeth v. Bd. of Cnty. Commis. Frederick Cnty., 673 F.3d 333, 339 (4th Cir. 2012)). Some courts, including the Fourth Circuit, have held that an "exigent circumstances" exception applies to Title II, which might absolve public entities of their duty to provide any reasonable accommodation. See Waller, 556 F.3d at 174–75; Hainze v. Richards, 207 F.3d 795 (5th Cir. 2000). In Waller, the Fourth Circuit determined that it need not decide whether there was an exigent circumstance in that case, but noted: "reasonableness in law is generally assessed in light of the totality of the circumstances, and exigency is one circumstance that bears materially on the inquiry into reasonableness under the ADA. Accommodations that might be expected when time is of no matter become unreasonable to expect when time is of the essence." Waller, 556 F.3d at 175.

In the Amended Complaint, Plaintiff alleged that the City had violated Title II of the ADA by failing to provide Ms. Williams "with communication that was as effective as communication provided to the general public detained and under the exclusive custody of law enforcement." See Amended Complaint (#23) at ¶ 138. See also 28 C.F.R. § 35.160(a)(1) (Department of Justice regulations on nondiscrimination on the basis of disability, providing

that: "[a] public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."). Plaintiff also alleged that the City failed to: 1) train and supervise agents and employees to recognize and identify mentally ill persons; 2) train and supervise agents and employees to effectively communicate and interact with mentally ill persons; and 3) adopt, implement, and enforce adequate policies and procedures to provide effective communication and interaction with mentally ill persons and that such actions violated the ADA. Id. at ¶¶ 141. However, in Plaintiff's Response Brief, she argues solely that the City failed to provide Ms. Williams with a reasonable accommodation during her arrest. See (Pl. Resp. (#71) at p. 26-27) (asserting that "Tanisha was an individual with a disability. Due to the City's failure to provide a reasonable accommodation of medical care during the midst of Tanisha's manic episode, her behavior escalated to suicide, causing her to suffer great and permanent injury."). Plaintiff's Response on the ADA claim was limited to five sentences in her brief. Id. Plaintiff did not address the ADA claim at oral argument. It thus appears that Plaintiff has abandoned her initial allegations regarding a failure to train and instead now claims that Plaintiff was denied an appropriate accommodation. As Plaintiff has offered no argument on the "failure to train" officers in the context of the ADA, the court cannot allow the claim to proceed and will consider it abandoned. [3] See Ferdinand-Davenport v. Children's Guild, 742 F. Supp. 2d

_____

[3] Even though the court believes that Plaintiff has abandoned her "failure to train" argument pursuant to the ADA, for the sake of thoroughness, the court has considered it in light of the record and finds that it may not proceed past summary judgment. While the Fourth Circuit has explicitly declined to answer the question of whether the ADA supports such a claim, see Waller ex rel. Estate of Hunt v. Danville, VA, 556 F.3d 171, 177 (4th Cir. 2009), at least one district court in this circuit has recognized that it may be possible to proceed with a "failure to train" claim under Title II of the ADA under the appropriate circumstances. See Estate of Saylor v. Regal Cinemas, Inc., 54 F. Supp. 3d 409, 424 (D. Md. 2014). Other courts around the country have also allowed such claims to proceed. See, e.g., Hogan v. City of Easton, Civ. No. 04–759, 2004 WL 1836992, at *7 (E.D.Pa. Aug. 17, 2004) (stating that the "Complaint states a valid claim under the ADA based on the failure of the [defendants] to properly train its police

772, 777 (D. Md. 2010) (dismissing claim where plaintiff failed to respond to arguments in briefing on a motion to dismiss); <u>Mentch v. Eastern Savings Bank, FSB</u>, 949 F.Supp. 1236, 1247 (D.Md.1997) ("[Plaintiff] abandoned her harassment claim by failing to address that claim in her opposition to [defendant's] motion for summary judgment, or to offer clarification in response to [defendant's] reply brief.").

To the extent that Plaintiff wishes to assert a claim for a failure to accommodate under the ADA, the court cannot accept an argument set forth in a response brief unrelated to the facts and causes of action alleged in the Amended Complaint. As with all litigation, this case has been structured around the claims and request for relief asserted in the Amended Complaint, which puts the opposing party on notice of the legal claims being asserted against it. <u>See</u> FED. R. CIV. P. 8. The Amended Complaint simply makes no mention of a failure to accommodate based on denial of medical attention. Moreover, Plaintiff's cursory statement in its response brief that the encounter at issue constituted a failure to accommodate based on the failure to provide medical attention under the ADA falls far short of creating a genuine dispute of material fact as to whether Plaintiff might ultimately prevail on such claim at trial. It is not the role of this court to make the parties' arguments for them. Based on the bare assertions in the briefing and lack of

---

officers for encounters with disabled persons"); <u>Lewis v. Truitt</u>, 960 F.Supp. 175, 178 (S.D.Ind.1997) (noting that the legislative history of Title II suggests an implied duty to train officers as to how to interact with disabled persons during an arrest: "In order to comply with the non-discrimination mandate, it is often necessary to provide training to public employees about disability. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in the recognition of and aid of seizures. Such discriminatory treatment based on disability can be avoided by proper training.") (quoting H.R.Rep. No. 101–485, pt. III, 101st Cong., 2nd Sess. 50, reprinted in 1990 U.S.C.C.A.N. 445, 473)). While the claim appears to be legally appropriate in certain circumstances, the court finds that for the same reasons Plaintiff's failure to train argument as to the City in the context of the gross negligence claim fails, the same claim pursuant to the ADA fails. The record and evidence offered by Plaintiff in this case simply fail to call into question the evidence set forth by the City that the officers did, in fact, receive training in dealing with mentally ill arrestees. <u>See</u> <u>supra</u>.

any argument as to a failure to accommodate claim, such claim is appropriate for dismissal at this summary judgment stage.

However, even if the court were to consider Plaintiff's arguments on a failure to accommodate under the ADA, such claim would be appropriate for dismissal based on her failure to set forth sufficient evidence to support such claim. Whether a disabled individual succeeds in proving discrimination under Title II of the ADA will depend on whether the officers' accommodations (or lack thereof) were reasonable under the circumstances. <u>Williams v. City of New York</u>, 121 F. Supp. 3d 354, 368 (S.D.N.Y. 2015) (citing <u>Waller</u>, 556 F.3d at 175). Plaintiff argues that Ms. Williams was bi-polar, had repeated suicide attempts and multiple hospitalizations, and that such conditions render her an individual with a disability. However, even assuming that Ms. Williams qualifies as an individual with a disability under Title II,[4] the responding and arresting officers were unaware of her medical history and had no way of knowing that she had previously attempted to commit suicide. Instead, the record is replete with evidence that the officers did not know who Ms. Williams was, had never met her before December 5, 2011, and could not identify her, let alone ascertain her medical history, despite their efforts to do so. The Tenth Circuit recently noted that where a "police officer incurs a duty to reasonably accommodate a person's disability during an arrest, this duty would have arisen only if [that officer] had known that [the disabled arrestee] needed an accommodation." <u>J.H. ex</u>

_____

4 Within the ADA,

the term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).

rel. J.P. v. Bernalillo Cty., 806 F.3d 1255, 1261 (10th Cir. 2015) (citing Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d 1185, 1196 (10th Cir. 2007) ("Before a public entity can be required under the ADA to provide a disabled individual an auxiliary aid or service, a public entity must have knowledge of the individual's disability and the individual's need for an accommodation."). As in Bernalillo Cty., Plaintiff here never asked the arresting officers for any accommodation and the officers have testified that they did not recognize her as a person with mental disabilities, but viewed her behavior as consistent with other arrestees they had encountered who were upset and/or fearful over being arrested. See (Howard Dep. (#59-5) at 53:20-54-6; Goode Dep. at 122:1-9).

Plaintiff notes that although the officers on the scene stated that they did not believe that Ms. Williams' emotional behavior was indicative of mental illness, the police dispatch advised the Medical team, "I think she's a psych patient she's under arrest banging her head against everything." See (Pl. Response (#71) (citing audio of police dispatch from Pl. Ex. 15, Track 2)[5]. Even in the light most favorable to Plaintiff, as the sole piece of evidence that she points to, this

---

5 While Plaintiff cites this statement as an exhibit in the record, Exhibit 15 is a one-page document which reads, "EXHIBIT 15 Audio Dispatch Transmission (CD of the Audio Dispatch Transmission can be submitted if required by the Court)." The court did not require Plaintiff to submit such audio, but notes that it is Plaintiff's burden to set forth all evidence before the court at the summary judgment phase, not the court's burden to track down evidence that a party claims to have. See Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) ("The summary judgment inquiry…scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial…the summary judgment procedure allows the court to forecast the proof at trial to determine whether consequential facts are in dispute, and if not, to resolve the case without a trial."). See also United States v. Wilson, 115 F.3d 1185, 1188–89 (4th Cir. 1997) ("The proponent of an audio recording carries the burden of demonstrating that the recording was sufficiently authentic to be admitted into evidence."); Fed. R. Evid. 901. Nonetheless, for the purposes of this Order, the court will accept Plaintiff's characterization of the evidence as presented in its brief as true. See (Pl. Response (#71) at p. 27). Even with that assumption governing the court's analysis, and assuming that an officer made this statement while Plaintiff was actively banging her head and before the choking incident, the court finds that the success of Plaintiff's ADA claim at summary judgment cannot be premised on this statement alone.

statement alone cannot support a finding that the officers were aware that Ms. Williams was mentally ill, recognized that she needed an accommodation during her arrest so that she would not "suffer greater injury or indignity than other arrestees," Waller, 556 F.3d at 174, and failed to provide her with some sort of accommodation. The facts of this case as pled and argued by Plaintiff here are simply not appropriate for an ADA claim, and the court will therefore **GRANT** summary judgment as to Count VII.

### B. Defendant Officers' Motions for Summary Judgment

Plaintiff has brought the following claims against the Defendant Officers in their official and individual capacities: 1) negligence and gross negligence (Counts II, III, IV): and 2) § 1983 claims stemming from alleged Eighth and Fourteenth Amendment violations (Count V). Defendants have moved the court for summary judgment as to all claims. With respect to Plaintiff's negligence claims, the Defendant Officers assert that they are entitled to "public official immunity" under North Carolina law and therefore are immune from Plaintiff's suit alleging negligence and gross negligence. With respect to the § 1983 claims, they assert that they are entitled to qualified immunity and that Plaintiff has failed to identify disputed issues of material fact to preclude summary judgment.

### 1. *Negligence and Gross Negligence*

Plaintiff's negligence and gross negligence claims against Defendants Goode, White, and John Doe are set forth identically in the Amended Complaint. Plaintiff asserts that "at all times relevant to the incident alleged herein, [Defendants'] actions were malicious, intentional, unreasonable, willful and wanton, and grossly negligent….Based upon the severity and deliberately indifferent nature of [Defendants'] conduct, [they] are not entitled to immunity from

personal liability and may be sued in [their] individual capacity." <u>See</u> Amended Complaint at ¶¶ 86, 94, 102.

      *a. Individual Capacities*

      "The essence of the doctrine of public official immunity is that public officials engaged in the performance of their governmental duties involving the exercise of judgment and discretion, and acting within the scope of their authority, may not be held liable for such actions, in the absence of malice or corruption." <u>Price v. Davis</u>, 512 S.E.2d 783, 787 (N.C. Ct. App. 1999). The policy behind public official immunity allows for the promotion of "(1) the primary goal of allowing public officials to perform their duties vigorously without undue hampering and deterrence, and (2) the secondary goal of ensuring effective democratic government." <u>Wilcox v. City of Asheville</u>, 730 S.E.2d 226, 231 (N.C. Ct. App. 2012). In North Carolina, police officers are "public officials" and an officer is "[generally] immune from personal liability for mere negligence in the performance of his duties, but he is not shielded from liability if his alleged actions were corrupt or malicious or if he acted outside and beyond the scope of his duties." <u>Schlossberg v. Goins</u>, 540 S.E.2d 49, 56 (N.C. Ct. App. 2000) (citation omitted). "A public officer will not lose public official immunity if the officer's judgment is misguided, so long as the public officer acted without malice or corruption." <u>Perry v. Pamlico Cty.</u>, 88 F. Supp. 3d 518, 533 (E.D.N.C. 2015) (citing <u>Grad v. Kaasa</u>, 321 S.E.2d 888, 890 (N.C. 1984). Furthermore, "[North Carolina] courts recognize law enforcement as a governmental function…[and] [t]hus police officers enjoy absolute immunity from personal liability for their discretionary acts done without corruption or malice." <u>Schlossberg</u>, 540 S.E.2d at 56. Discretionary acts are "those requiring personal deliberation, decision, and judgment." <u>Id.</u>

An officer acts with malice if the act is "(1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." <u>Brown v. Town of Chapel Hill</u>, 756 S.E.2d 749, 755 (N.C. Ct. App. 2014) (quoting <u>Grad</u>, 321 S.E.2d at 890). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." <u>Id.</u> (quoting <u>Yancey v. Lea</u>, 550 S.E.2d 155, 157 (N.C. 2001)). An act is done with the intent to injure when the "officer's actions were so reckless or so manifestly indifferent to the consequences ... as to justify a finding of [willfulness] and wantonness equivalent in spirit to an actual intent." <u>Id.</u> (quoting <u>Wilcox v. City of Asheville</u>, 730 S.E.2d 226, 231 (N.C. Ct. App. 2012)).

The court finds that there are at least two genuine issues of material fact as to malice in this case. The first is whether or not Ms. Williams made the statement "I'm gonna kill my f***ing self" in the presence of Officers Goode or White and whether they heard it. Officer knowledge is relevant to the question of whether Ms. Williams' attempted suicide was foreseeable. Foreseeability of injury is an essential element of proximate cause, which in turn is an essential element of a negligence claim that is a question for the jury. <u>See</u> <u>Helmly v. Bebber</u>, 335 S.E.2d 182, 186 (N.C. Ct. App. 1985). The court also notes that "[s]ummary judgment is not favored in negligence cases, particularly in cases … in which the foreseeability of a prisoner's suicide is generally an issue for the jury." <u>Smith v. Phillips</u>, 451 S.E.2d 309, 314 (N.C. Ct. App. 1994). The court also finds that Officer Goode's statement to Ms. Williams while she is in the back of the police car but several minutes after she has stopped banging her head on the plexiglass, "quit doing what you're doing. You ain't going to hurt yourself." (DMVR 19:04:43), could lead a finder of fact to believe that he saw what she was doing in the back of the police car

but ignored her. The foregoing evidence, taken in the light most favorable to Plaintiff, is sufficient to raise a genuine issue of material fact as to the existence of the elements of malice, i.e., that the officers' actions could be found to be contrary to their duty, wanton, and so reckless as to justify a finding of intent to injure. See Wilcox, 730 S.E.2d at 233. The court will therefore **DENY** summary judgment as to the Defendant Officers in their individual capacities.

  b. *Official Capacities*

There is no dispute in this case that the Defendant Officers acted in their official capacities as police officers employed by the City of Charlotte when they arrested Ms. Williams. Defendant White argues that Plaintiff's negligence claims against him in his official capacity should be dismissed as duplicative. Defendant Goode does not argue this point and Plaintiff does not respond to the issue. The court recognizes that official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (internal quotation omitted). Therefore, in a suit where the plaintiff asserts a claim against a government entity, a suit against those individuals working in their official capacity for this government entity is redundant. Moore v. City of Creedmoor, 345 N.C. 356, 367 (1997)." See also Wright v. Town of Zebulon, 202 N.C. App. 540, 543 (2010) (holding that trial court properly dismissed claims against police officers in their official capacities where suit was also brought against the town that employed them); Armstrong v. City of Greensboro, No. 1:15CV282, 2016 WL 3167178, at *8 (M.D.N.C. June 6, 2016) ("duplicative claims against an individual in his official capacity when the government entity is also sued may be dismissed.") (collecting cases). Thus, Plaintiff's claims against the Defendant Officers in their official capacities are redundant, and are therefore **DISMISSED** as duplicative

because the City is also a named defendant and shall remain a Defendant going forward. See Grisson v. City of Fayetteville, No. 5:14-CV-272-BO, 2015 WL 5797661, at *6 (E.D.N.C. Oct. 2, 2015).

### 2. *42 U.S.C. § 1983 Claims*

Plaintiff's Amended Complaint asserts that, pursuant to the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment's prohibition against cruel and unusual punishment, Defendants Goode and White were required to provide Ms. Williams, a pretrial detainee, with "adequate and prompt medical care." Amended Complaint at ¶ 110. Plaintiff asserts that despite this obligation, Defendants were "deliberately indifferent" and that such indifference amounts to "punishment" in violation of the Eighth Amendment. Id. at ¶ 111. Plaintiff further asserts that Defendants "knew or should have known that [Williams] was suicidal or in need of emergency intervention, but acted with deliberate indifference in failing to take action to prevent [Williams] from injuring herself." Id. at ¶ 112.

The Defendant Officers respond by asserting qualified immunity from § 1983 claims. Further, they note that because Ms. Williams was a pretrial detainee—not a prisoner—the Eighth Amendment is inapplicable. Finally, both the Defendant Officers argue that even if the court finds them to not be entitled to qualified immunity, they were not "deliberately indifferent" in violation of Ms. Williams' Fourteenth Amendment due process rights.

### a. *Qualified Immunity as to § 1983 Claims against Defendant Officers in their Individual Capacities*

The defense of "[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012). The

purpose of qualified immunity is to "remove most civil liability actions, except those where the official clearly broke the law, from the legal process well in advance of the submission of facts to at jury." Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991). "[Q]ualified immunity protects law enforcement officers from personal liability for civil damages stemming from 'bad guesses in gray areas and ensures that they are liable only for transgressing bright lines.'" Santos v. Frederick Cty. Bd. of Comm'rs, 725 F.3d 451, 468 (4th Cir. 2013) (citing Willingham v. Crooke, 412 F.3d 553, 558 (4th Cir. 2005).

"Officials will receive immunity unless the § 1983 claim satisfies a two-prong test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right and (2) the right was clearly established such that a reasonable person would have known his acts or omissions violated that right." Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011) (citation and internal quotation marks omitted). The court may address these questions in either order, but Appellant's case will survive summary judgment "only if we answer both questions in the affirmative." Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 898 (4th Cir. 2016) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)).

To be "clearly established," a right must be sufficiently clear that every "reasonable official would understand that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2078 (2011). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle, 132 S. Ct. at 2093 (quoting al-Kidd, 131 S. Ct. at 2083). Furthermore, it is vital that "[t]his inquiry...be undertaken in light of the specific context of the case, not as a broad general proposition." Id. at 2094. Because this test requires a determination of the reasonableness of an officer's actions, it requires "careful attention to the

facts and circumstances of each particular case." <u>Clem v. Corbeau</u>, 284 F.3d 543, 550 (4th Cir. 2002) (citing <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)). "Recognizing that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving'—we take care to consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the '20/20 vision of hindsight.'" <u>Id.</u> (citing <u>Graham</u>, 490 U.S. at 397).

"There is no question that when the historical facts are undisputed, whether a reasonable officer should have known of the illegality of his conduct is a question of law for the court. The existence of disputed material facts—which must be submitted to a jury—does not alter the 'essentially legal' nature of the question of whether the right at issue was clearly established." <u>Willingham v. Crooke</u>, 412 F.3d 553, 560 (4th Cir. 2005) (internal citation omitted). Disputed factual issues that are material to the issue of qualified immunity must be decided by a jury, whereas the determination of whether qualified immunity applies is a legal question for the court. <u>See</u> <u>id.</u> (holding that "to the extent that a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury.").

i.   <u>Legal Framework for Alleged Eighth Amendment Violations</u>

Plaintiff asserts that Ms. Williams' Eighth Amendment rights were violated in that Defendants White and Goode were deliberately indifferent to her suicide attempt. Plaintiff asserts that this deliberate indifference amounted to "cruel and unusual punishment." In response, the Defendant Officers both argue that the Eighth Amendment is not applicable

because at the time of the officers' allegedly unconstitutional conduct, Ms. Williams was a pretrial detainee, not a prisoner. The court agrees. Pretrial detainees are protected from "punishment" as well as the deliberate indifference of police officers who are holding them in custody, but such protection is afforded by the Fourteenth Amendment, not the Eighth. See <u>Slade v. Hampton Roads Regional Jail,</u> 407 F.3d 243, 248 (4th Cir. 2005) ("because Slade is a pretrial detainee, not a prisoner, the protections afforded by the Due Process Clause of the Fourteenth Amendment, and not those afforded by the Eighth Amendment, apply."). Thus, to the extent Plaintiff alleges a § 1983 claim based on the Eighth Amendment, the court **GRANTS** summary judgment because the Eighth Amendment does not apply to pretrial detainees.

   ii. <u>Legal framework for Alleged Fourteenth Amendment Violations</u>

  Plaintiff argues that Defendants' conduct during Ms. Williams' detention and suicide attempt in the back of the police vehicle amounted to "deliberate indifference," based on the officers' decision not to apply a leg restraint, wait for a supervisor to come, and not to call medical personnel even though Ms. Williams was non-responsive for six minutes after she stopped hitting herself against the plexiglass.

   "Broadly speaking, the substantive due process provision of the Fourteenth Amendment protects against egregious, arbitrary governmental conduct.  Only governmental conduct that 'shocks the conscience' is actionable as a violation of the Fourteenth Amendment." <u>Young v. City of Mount Ranier</u>, 238 F.3d 567, 574 (4th Cir. 2001). "[D]eliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause." <u>Id.</u> at 575. "Liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process; rather, conduct intended to injure and which is unjustifiable by any government interest is the

sort of official action most likely to rise to the conscience-shocking level." County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998). "The standard for deliberate indifference is very high—a showing of mere negligence will not meet it. Instead, an official acts with deliberate indifference only when he knows of and disregards the risks posed by the detainee's serious medical needs." Estate of Harvey ex rel. Dent v. Roanoke City Sheriff's Office, 585 F. Supp. 2d 844, 855 (W.D. Va. 2008) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994); Grayson v. Peed, 195 F.3d 692, 695 (4th Cir.1999)) (internal quotation marks omitted).

For Plaintiff to show that Defendants were deliberately indifferent, two elements must be established. First, Plaintiff must show that Defendants "actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." Young, 238 F.3d at 576. The Fourth Circuit has previously held that "where police know that a pretrial detainee is on the verge of suicide, that psychological condition can constitute the kind of serious medical need to which state officials must, under the due process clause, not be deliberately indifferent." Buffington v. Baltimore County, Md., 913 F.2d 113, 120 (1990). Defendants must be both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Regarding the first prong of the "deliberate indifference" test, the Supreme Court has said that "whether an [officer holding a detainee in custody] had the requisite knowledge of a substantial risk [is] a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that [an officer] knew of a substantial risk from the very fact that a risk was obvious." Id. at 842. Thus, "even under this subjective standard, [an officer] cannot hide

behind an excuse that he was unaware of a risk, no matter how obvious." Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995).

Second, there must be a subjective awareness on the part of the Defendants that their response in light of the perceived risk was inappropriate or insufficient. Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 1997). With regard to the "knowingly inappropriate response" prong, "the Fourth Circuit has made clear that 'the question in deliberate indifference cases is not whether the officials could have taken additional precautions—almost invariably, with the benefit of 20/20 hindsight, there are additional precautions that could have been taken.'" Estate of Harvey v. Roanoke City Sheriff's Office, 585 F. Supp. 2d 844, 858 (W.D. Va. 2008) (quoting Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 309 (4th Cir. 2004) (emphasis added). Rather, what the law requires is a reasonable response in light of the perceived risk. See Brown, 240 F.3d at 390.

Here, the court finds that genuine issues of material fact preclude summary judgment on this count. Pretrial detainees such as Plaintiff have a clearly established right to be free from deliberate indifference of state officials regarding that detainee's serious medical needs. In the light most favorable to Plaintiff, there is a factual dispute as to whether Ms. Williams threatened to kill herself in the presence of Officers Goode and White. Additionally, whether the officers were aware of Ms. Williams' threat of self-harm is in dispute, as evidenced by Officer Goode's statement, "stop doing that. You ain't going to hurt yourself," made after she had stopped hitting her head against the plexiglass and while looking in the back of the police car. Resolution of such disputed factual issues are material to the question of whether they knew she needed medical attention or other intervention, and whether they were deliberately indifferent to her

medical needs. Accordingly, the court will **DENY** Defendants' Motion for Summary Judgment on the § 1983 claim made as to deliberate indifference under the Fourteenth Amendment.

i.   Official Capacities

As with the negligence claims, Defendant White argues that the § 1983 claim against him in his official capacity should be dismissed as duplicative. Again, Defendant Goode does not make this argument and Plaintiff does not raise the issue. The court agrees that the claim is duplicative. As noted above, official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985). The Fourth Circuit has likewise held that such "official capacity claims" are essentially the same as a claim against the principal-entity and should be dismissed as duplicative when the entity is also named as a defendant. See Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004). ("The district court correctly held that the § 1983 claim against Martin in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative.") (citing Kentucky, 473 U.S. at 165-66). Thus, because the City remains a Defendant in this action, the court will **DISMISS** the official capacity § 1983 claims as to the Defendant Officers. See Armstrong v. City of Greensboro, No. 1:15CV282, 2016 WL 3167178, at *8 (M.D.N.C. June 6, 2016) ("duplicative [§ 1983] claims against an individual in his official capacity when the government entity is also sued may be dismissed.") (collecting cases); W.E.T. v. Mitchell, No. 1:06CV487, 2007 WL 2712924, at *10 (M.D.N.C. Sept. 14, 2007) ("Because the government entity in this case has also been sued, Plaintiffs' [§ 1983] claims against Denlinger in her official capacity are dismissed…"). See also Santos v. Frederick Cty. Bd. of Comm'rs, 725 F.3d 451, 470 (4th Cir. 2013) ("Unlike with government officials sued in

their individual capacity, qualified immunity from suit under Section 1983 does not extend to municipal defendants or government employees sued in their official capacity.") (citing <u>Owen v. City of Independence, Mo.</u>, 445 U.S. 622, 650 (1980).

## IV.   CONCLUSION

In accordance with the foregoing analysis, the court will grant Defendants' Summary Judgment Motions in part and deny them in part, and therefore enters the following Order.

## ORDER

**IT IS, THEREFORE, ORDERED** that:

1) The Motion for Summary Judgment by the City of Charlotte (#58) is **GRANTED in part and DENIED in part**, as explained herein;

2) the Motion for Summary Judgment by Wayne Goode, III (#61) is **GRANTED in part and DENIED in part**, as explained herein; and

3) the Motion for Summary Judgment by Joseph White (#65) is **GRANTED in part and DENIED in part**, as explained herein.

**IT IS FURTHER ORDERED** that the claims against the Defendant Officers in their official capacities are **DISMISSED as duplicative**, as explained herein.

Signed: July 22, 2016



Max O. Cogburn Jr.
United States District Judge